23CA2063 Marriage of DiCamillo 10-24-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2063
Elbert County District Court No. 22DR16
Honorable Theresa Slade, Judge

---

In re the Marriage of

Tammy Rena Rollins,

Appellee,

and

Randy DiCamillo,

Appellant.

---

ORDER AFFIRMED

Division VI
Opinion by JUDGE BROWN
Welling and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

---

No Appearance for Appellee

Law Office of Timothy C Dietz, PLLC, Timothy C. Dietz, Colorado Springs,
Colorado, for Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Appellant, Randy DiCamillo, appeals the district court's issuance of a permanent civil protection order restraining his contact with Tammy Rena Rollins.  We affirm.

## I.     Background

¶ 2     In May 2021, DiCamillo reportedly struck Rollins three times in the presence of the parties' minor child while Rollins drove DiCamillo home from the hospital following a surgical procedure he had undergone earlier that day.  DiCamillo was charged with third degree assault, domestic violence, and child abuse (the 2021 criminal case).[1]  The county court issued a mandatory protection order (MPO) restraining DiCamillo's contact with Rollins.  DiCamillo subsequently pleaded guilty to third degree assault, and the county court sentenced him to twelve months of supervised probation as part of a deferred disposition.

¶ 3     In February 2022, Rollins filed a petition for dissolution of her common law marriage to DiCamillo.[2]

---

[1] We take judicial notice of Elbert County case number 21M56 as a related case under CRE 201(b).  *See Doyle v. People*, 2015 CO 10, ¶ 12; *People in Interest of I.S.*, 2017 COA 155, ¶ 7.

[2] Rollins filed the case in El Paso County, but it was later transferred to Elbert County.

¶ 4    In October 2023, DiCamillo completed the requirements associated with his deferred disposition. As a result, the county court vacated the MPO and sealed the underlying case. Two days later, Rollins filed a verified motion for a civil protection order in the dissolution proceeding, recounting several instances of physical abuse and controlling and coercive behavior by DiCamillo occurring over a period of sixteen years. In the motion, Rollins explained that she was making the request because the MPO had been vacated two days earlier, stating "[DiCamillo] completed probation, so now the protection order ends for me." A temporary civil protection order (TPO) was issued the same day.

¶ 5    The district court subsequently held a two-day hearing to determine whether the TPO should be made permanent. After considering the evidence, the court found "by a preponderance of the evidence that Mr. DiCamillo had committed the acts constituting grounds for the issuance of a protection order and that, unless restrain[ed], will continue to commit such acts that are designed to intimidate and retaliate against Ms. Rollins." Accordingly, the court issued a permanent civil protection order (PPO) restraining DiCamillo's contact with Rollins.

## II.     Analysis

¶ 6     DiCamillo contends that the district court erred by (1) failing to hold a statutorily mandated hearing before issuing the TPO; (2) prohibiting the parties' minor child from testifying during the PPO hearing; and (3) finding that DiCamillo would continue to commit acts designed to intimidate or retaliate against Rollins unless restrained.  We perceive no reversible error.

### A.     Statutory Framework

¶ 7     Section 13-14-104.5, C.R.S. 2024, authorizes a court to issue a temporary or permanent civil protection order to prevent, among other things, domestic abuse and assault.  § 13-14-104.5(1)(a); *Martin v. Arapahoe Cnty. Ct.*, 2016 COA 154, ¶ 16.  The statute requires that "[a] motion for a temporary civil protection order shall be set for hearing at the earliest possible time," although the hearing may be ex parte.  § 13-14-104.5(4); *see Martin*, ¶ 18.  If "after hearing the evidence" the court is "fully satisfied therein that sufficient cause exists," it may issue a TPO and a citation "to the respondent commanding [them] to appear before the court . . . to show cause, if any, why said temporary civil protection order should not be made permanent."  § 13-14-104.5(8).

¶ 8     At the hearing on the PPO, the court "shall examine the record and the evidence" to decide whether to make the TPO permanent or to enter a PPO on different terms.  § 13-14-106(1)(a), C.R.S. 2024; *see also Martin*, ¶ 20.  To issue a PPO, the court must find by a preponderance of the evidence that the person to be restrained (1) "has committed acts constituting grounds for issuance of a civil protection order" and (2) "unless restrained will continue to commit such acts or acts designed to intimidate or retaliate against the protected person."  § 13-14-106(1)(a).  The grounds for issuing a civil protection order are those set forth in section 13-14-104.5(1)(a).  *See Martin*, ¶ 20.

## B.     TPO Hearing

¶ 9     DiCamillo contends that the PPO is invalid because the district court failed to hold a hearing before granting the TPO.  Even assuming that a hearing was required and not held, we conclude that any error was harmless.

### 1.     Standard of Review

¶ 10     Statutory construction and application present questions of law that we review de novo.  *Hickerson v. Vessels*, 2014 CO 2, ¶ 10.  If we identify an error, we review for harmlessness and will reverse

4

only if the error affected a party's substantial right. C.R.C.P. 61; *People in Interest of R.D.*, 2012 COA 35, ¶ 25. "An error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (citation omitted).

### 2. Any Error in Failing to Hold a TPO Hearing Is Harmless Because DiCamillo Was Provided a Full Hearing Before the PPO Was Granted

¶ 11 DiCamillo contends that the district court failed to hold a statutorily required hearing before issuing the TPO. He further contends that, because the TPO was procedurally flawed, the PPO is invalid.

¶ 12 In support of his contention, DiCamillo alleges that as of December 2, 2023, the district court's electronic filing system reflected that a hearing had been held on October 27, 2023, the day the TPO was issued. Because the filing system reflected that a hearing had taken place, DiCamillo's counsel requested the transcripts from that day. Two days later, DiCamillo's counsel "received a call from the transcription service" to inform him that "a hearing for the issuance of the temporary protection order in this

matter was never held on October 27." Further, after counsel filed a revised transcript request, the district court "scrubbed and removed from the electronic filing system the reference to the non-existent hearing."

¶ 13    While we struggle to understand how the string of events DiCamillo sets forth could even be possible — particularly his claim that the register of actions in the underlying case file was altered to remove a hearing event — the record provides no clarity as to whether or not the district court actually held a hearing before issuing the TPO. Still, even assuming that a TPO hearing was not held, we conclude that any error is harmless.

¶ 14    DiCamillo contends that "a valid temporary protection order is a condition precedent to issuance of a permanent protection order" and "[t]he absence of a valid temporary protection order warrants vacating the permanent protection order." But the plain language of the governing statutes does not so provide, and DiCamillo cites no other authority supporting these bald contentions. As the appealing party, DiCamillo "bears the burden to provide supporting authority for contentions of error asserted on appeal." *Biel v. Alcott,* 876 P.2d 60, 64 (Colo. App. 1993).

¶ 15 In any event, "a temporary protection order issued under section 13-14-104.5 is not the . . . court's 'final decision' on a plaintiff's request for a civil protection order." *Martin*, ¶ 22. Rather, the procedure governing TPOs merely "permits [a] court to make an initial determination as to whether an imminent danger exists to the person seeking protection, and issue a temporary protection order based on that finding." *Id.*; *see* § 13-14-104.5. Conversely, section 13-14-106(1)(a) "contemplates that a final ruling regarding the plaintiff's entitlement to a civil protection order, and the terms of the order, will be made at the permanent order hearing." *Martin*, ¶ 22.

¶ 16 Additionally, while section 13-14-104.5 plainly requires that a hearing be set prior to granting a TPO, the statute permits the hearing to be conducted ex parte. § 13-14-104.5(4). Because DiCamillo had no right to be present at any TPO hearing, we fail to see, and he has failed to articulate, how he was prejudiced.

¶ 17 Finally, the district court held a two-day PPO hearing during which it weighed the evidence and evaluated the parties' credibility. *See Parocha v. Parocha*, 2018 CO 41, ¶ 16 (It is the trial court's "prerogative to weigh and evaluate the parties' credibility."); *see also*

*Martin,* ¶ 23 ("The permanent protection order hearing gives the respondent a prompt opportunity to challenge the court's initial ex parte findings and raise any jurisdictional or procedural deficiencies."). Rollins testified and answered questions from both the court and DiCamillo's counsel. DiCamillo did the same during the second day of the hearing. After hearing the parties' testimony, observing the parties' demeanor, and considering the evidence presented, the court found that Rollins had met her burden of proof and granted the PPO.

¶ 18      Because DiCamillo had the benefit of presenting evidence during a two-day hearing before the PPO was granted, we conclude that any failure to hold a hearing before the TPO was granted was harmless. The alleged error had no effect on DiCamillo's substantial rights in these proceedings. *See Martin,* ¶ 23 ("[T]he permanent order hearing and ordinary appellate procedures provide adequate alternative remedies for challenging a temporary restraining order.").

8

## C.     Minor Child's Testimony

¶ 19     DiCamillo contends that the district court abused its discretion by prohibiting the parties' minor child from testifying during the PPO hearing.  We are not persuaded.

### 1.     Standard of Review

¶ 20     We review a trial court's determination regarding the admissibility of evidence for an abuse of discretion.  *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 29.  A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or is based on an erroneous understanding or application of the law.  *Id.*

### 2.     The District Court Did Not Abuse Its Discretion by Preventing the Minor Child from Testifying

¶ 21     In Rollins' verified motion for a civil protection order, she alleged that DiCamillo had "beat [her] in front of [her] kids a lot [from January] 2005 until May 22, 2021."  At the PPO hearing, DiCamillo sought to call the parties' fourteen-year-old son as a witness to disprove Rollins' allegation.  Specifically, DiCamillo's counsel explained that the child would testify that "he [did not] observe either party striking [the] other and never observed any bruises or black eyes on Ms. Rollins."

¶ 22    As we understand the district court's ruling, it prohibited the minor child from testifying for two reasons. First, the court theorized that if the child would testify that he did not see the abuse happen, then he was not a relevant witness to speak to the allegations of abuse. Second, the court was concerned about the negative impact on the child's wellbeing that would result from being thrust into the middle of his parents' conflict, explaining that it is inappropriate "for a child to testify in his parents' proceedings regarding a temporary or permanent protection order involving domestic abuse."

¶ 23    DiCamillo contends the court erred because "it was reasonable for [him] to have [their fourteen] year old son present at the courthouse to refute Ms. Rollins's outlandish claims." He argues that the minor child's testimony would have refuted Rollins' claim "that she was subjected to repeated beatings over a [sixteen -]year period resulting in long-lasting and visible injuries." We perceive no abuse of discretion.

¶ 24    First, the child's proposed testimony that no abuse occurred would not be relevant unless the minor child was physically present for every single interaction between his parents, a circumstance no

10

one claims to exist. *See* CRE 402 ("Evidence which is not relevant is not admissible."); *see also* CRE 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter."). And although Rollins alleged that DiCamillo had "beat [her] in front of [her] kids," Rollins has two children from a prior marriage. Thus, establishing that one child did not witness the abuse does not disprove Rollins' allegation, as "my kids" may have meant her two other children. *See Smith v. Bd. of Educ.*, 83 P.3d 1157, 1165 (Colo. App. 2003) ("A trial court has considerable discretion in determining whether evidence has logical relevance.").

¶ 25    Second, even assuming the child's proposed testimony that he did not see bruises or black eyes on Rollins was marginally probative to show that the abuse did not happen as Rollins claimed, the court nonetheless acted within its discretion by excluding it. At the heart of the court's ruling is a careful balancing of the best interests of the minor child against the minimal probative value of his testimony. *See* CRE 403 ("Although relevant, evidence may be

11

excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . [or] confusion of the issues.").[3]

¶ 26 One of the purposes of the Uniform Dissolution of Marriage Act, the act governing the dissolution case in which the PPO was entered, is "[t]o mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage." § 14-10-102(2)(b), C.R.S. 2024; *see also* § 14-10-104.5, C.R.S. 2024. Indeed, the district court is required to consider the best interests of the child in such matters, "giving paramount consideration to the child's safety and the physical, mental, and emotional conditions and needs of the child." § 14-10-124(1.5), C.R.S. 2024.

¶ 27 For these reasons, "the preferred method" of receiving evidence from a child in a dissolution proceeding is by in camera interview, *Haase v. Haase*, 460 S.E.2d 585, 680-81 (Va. Ct. App. 1995), which

---

[3] Although we recognize that the "unfair prejudice" contemplated by CRE 403 is not harm to a child resulting from having to testify in favor of one parent against another, *see Kelly v. Haralampopoulos*, 2014 CO 46, ¶ 47 ("[U]nfair prejudice" means "an undue tendency on the part of admissible evidence to suggest a decision made on an improper basis.") (citation omitted), we cannot say the court abused its discretion in balancing the competing interests as it did.

neither party requested in this case. That is because "[n]o person who is a party to a divorce proceeding — litigant, counsel, or [judicial officer] — relishes the spectacle of a child testifying in open court as to [their] preference for one parent over another." *Id.* at 680. An in camera interview allows the court to receive evidence from the child while "(1) lessening the ordeal for the child by eliminating the harm a child might suffer from exposure to the adversarial nature of the proceedings; (2) enhancing the child's ability to be forthcoming; and (3) protecting the child from the 'tug and pull of competing custodial interests.'" *People in Interest of H.K.W.*, 2017 COA 70, ¶ 18 (quoting *Ynclan v. Woodward*, 237 P.3d 145, 150-51 (Okla. 2010)).

¶ 28 We acknowledge that, unlike *Haase* and *H.K.W.*, the proceeding that resulted in issuance of the PPO was not a hearing to determine the allocation of parental responsibilities. Nonetheless, the considerations animating those decisions apply equally here, where allowing the child to testify would necessarily embroil him in his parents' extraordinary conflict to his detriment. As DiCamillo's counsel conceded, the child was "pretty stressed over having to be [t]here [that day]." The probative value of the

13

evidence was slight while the risk of harm to the child was great. On this record, we cannot conclude that the district court's decision to exclude his testimony was manifestly arbitrary, unreasonable, or unfair. *See Gebert*, ¶ 29.

### D. The District Court's Finding that Unless Restrained, DiCamillo's Conduct Will Continue

¶ 29     DiCamillo contends that the district court erred by finding that he would continue to engage in domestic abuse or intimidating and retaliatory conduct against Rollins unless restrained. We disagree.

### 1. Standard of Review

¶ 30     We review a trial court's factual findings for clear error. *Lo Viento Blanco, LLC v. Woodbridge Condo. Ass'n, Inc.*, 2021 CO 56, ¶ 17. A finding of fact is clearly erroneous if there is no support for it in the record. *In re Marriage of Evans*, 2021 COA 141, ¶ 39. It is for the trial court to determine witness credibility and the weight, probative force, and sufficiency of the evidence, as well as the inferences and conclusions to be drawn therefrom. *In re Mariage of Thorburn*, 2022 COA 80, ¶ 49; *see also In re Marriage of Amich*, 192 P.3d 422, 424 (Colo. App. 2007) ("The trial court can believe all,

part, or none of a witness's testimony, even if uncontroverted, and its resolution of conflicting evidence is binding on review.").

### 2.    The Record Supports the Court's Finding

¶ 31    DiCamillo challenges the district court's finding as to the second requirement for issuing a PPO — that "unless restrained [he] will continue to commit such acts or acts designed to intimidate or retaliate against the protected person."  § 13-14-106(1)(a).

¶ 32    Rollins attested or testified to the following:

- She suffered mental, emotional, and physical abuse at the hands of DiCamillo for approximately sixteen years. The abuse occurred in situations where there were rarely witnesses aside from children, nieces, or nephews, and it "was always hidden."

- DiCamillo engaged in aggressive and violent behavior toward Rollins, including pinning her against a bedroom floor and repeatedly striking her face, hitting her while she was driving a car with their minor child in the back seat in 2021, and breaking her glasses and "put[ting] [her] out on the side of the road" in 2017.

- DiCamillo engaged in coercive and controlling behavior toward Rollins relative to transportation, including disabling her car to prevent her departure following an argument in 2008, forcing her out of the car in 2017, and taking the keys out of the ignition while she was driving in 2021.

- Rollins submitted photo and audio evidence in support of her allegations of abuse. The photos pertained to separate incidents of abuse that occurred in 2017 and 2019. The audio recording pertained to a verbal argument in 2019 relating to the minor child's schooling during which DiCamillo levied threats of violence against Rollins.

- DiCamillo previously pleaded guilty to third degree assault on Rollins. Rollins said the MPO entered in the 2021 criminal case provided her with a "security blanket" and that when DiCamillo completed his deferred judgment requirements and the MPO was vacated, so was her sense of security. Rollins filed for a TPO two days later.

¶ 33   DiCamillo contends that the district court "failed to articulate any facts or basis as [to] how Mr. DiCamillo could pose a continuing threat to Ms. Rollins even if the abuse as alleged actually occurred." Specifically, he argues "[t]he only actionable abuse is related to Mr. DiCamillo's deferred disposition in the 2021 criminal case and possibly the disabling of the motor vehicle when Ms. Rollins was pregnant some [thirteen] years earlier." Further, DiCamillo argues that because the parties now live approximately thirty-six miles away from each other and "Rollins admitted she has [not] observed Mr. DiCamillo anywhere near her residence since the parties separated in May, 2021," "[t]here was absolutely no basis for finding that Mr. DiCamillo constitutes a continuing threat under these circumstances."

¶ 34   Although the district court could have been more explicit as to why it found that DiCamillo posed a continuing threat to Rollins, the record nonetheless supports that finding — especially under the applicable preponderance of the evidence standard, *see* § 13-14-106(1)(a), which requires only that the court find the existence of a contested fact to be more probable than not, *Life Care*

*Ctr. of Am. v. Indus. Claim Appeals Off.*, 2024 COA 47, ¶ 15. We reach this conclusion for three reasons.

¶ 35 First, given that the alleged domestic abuse — including the coercive and controlling behavior[4] — occurred repeatedly over a period of sixteen years, it is not unreasonable to believe that the conduct would continue to occur unless restrained. Rollins testified that the physical abuse began a mere two weeks after the parties began cohabitating in 2005. She recounted instances of domestic abuse occurring in 2008, 2017, 2019, and most recently in 2021 when DiCamillo pleaded guilty to third degree assault.

¶ 36 We are unpersuaded by DiCamillo's argument that since the last claimed incident of abuse was in 2021, he does not pose a continuing threat to Rollins. The argument ignores the fact that an MPO restraining DiCamillo's contact with Rollins was issued in 2021 and remained in place until just two days before Rollins

---

[4] In the context of civil protection orders, "domestic abuse" is defined as "any act, attempted act, or threatened act of violence, stalking, harassment, or coercion that is committed by any person against another person to whom the actor is currently or was formerly related, or with whom the actor is living or has lived in the same domicile, or with whom the actor is involved or has been involved in an intimate relationship." § 13-14-101(2), C.R.S. 2024.

18

sought a TPO.  Thus, it is not particularly telling that DiCamillo has not intimidated or retaliated against Rollins since he last admitted to abusing her.  DiCamillo's argument may in fact prove the value of a protective order for these parties.  In any event, the extended duration of abuse supports the conclusion that it would continue absent restraint.  *See* § 13-14-104.5(7)(a) (A court "shall not deny a petitioner the relief requested because of the length of time between an act of abuse or threat of harm and the filing of the petition for a protection order.").

¶ 37     Second, the district court noted that credibility is particularly important in cases such as this where two parties offer contradictory testimony concerning the same events.  During the hearing, the court observed the parties' in-court demeanor and was best positioned to determine their credibility.  *See People v. Pitts*, 13 P.3d 1218, 1221 (Colo. 2000) ("It is the function of the trial court, and not the reviewing court, to weigh evidence and [determine] the credibility of the witnesses.").

¶ 38     In recounting its observations bearing on the parties' credibility, the court explained that, during direct examination, DiCamillo was more than willing to engage and answer questions,

19

but "[i]t was only when Ms. Rollins was asking questions[] that he suddenly had a lapse of memory."  Specifically, DiCamillo "[could not] remember the police responding; [could not] remember what he told the police; [and did] not recall being arrested" after he disabled Rollins car in 2008.  Further, DiCamillo argues that he only entered a plea relating to his assault of Rollins in 2021 to "keep the couple's son from testifying against his mother."  Yet in the present matter, DiCamillo sought to offer the minor child as a witness to do just that.  These findings are supported by the record and led the court to find that DiCamillo's testimony lacked credibility.

¶ 39    Finally, the district court's order emphasized DiCamillo's controlling and coercive conduct as evidence of the potential for ongoing domestic abuse.  The court pointed to the instance in which DiCamillo disabled Rollins' car in 2008 while she was pregnant, stating, "[DiCamillo] was quick to point out that the car he disabled was a car that he purchased."  The court noted that, in testifying about Rollins' cellphone, "[DiCamillo] was quick to explain to [Rollins] that it was his phone and she was only permitted to use it."  And the court highlighted a recent parenting time dispute that occurred while the MPO was still in place.  During that dispute,

Rollins believed she had permission to retrieve the minor child from DiCamillo earlier than parenting time orders allowed. But when she attempted to initiate the exchange, DiCamillo refused, drove away with the minor child to evade Rollins, and threatened Rollins with legal action, all while filming the interaction and telling the minor child what Rollins was doing wrong. Taken together, the court observed DiCamillo's "need to control these situations, sometimes without logic or explanation."

¶ 40 DiCamillo seizes on the court's concession that some of the alleged instances of abuse standing alone — for example, disabling Rollins' car in 2008 or the parenting time exchange dispute in 2021 — would not "be the basis for granting a protection order." But the cited examples are just two threads of a much larger tapestry. And we understand the court's ruling to mean that, although each isolated incident may not have been sufficient to sustain the PPO, the incidents viewed collectively met the standard.

¶ 41 We conclude that the record supports the district court's findings that DiCamillo "has committed acts constituting grounds for issuance of a civil protection order" and "unless restrained [he] will continue to commit such acts or acts designed to intimidate or

retaliate against the protected person." § 13-14-106(1)(a). We will not disturb these findings or the PPO.

## III. Disposition

¶ 42 The permanent civil protection order is affirmed.

JUDGE WELLING and JUDGE GRAHAM concur.